Thank you. Next case please. Case number 092440, Melissa Pielet v. Dennis Hiffman All right, would counsel approach please? Good morning. Good morning, Your Honor. I don't know if you heard what I said earlier, but we ordinarily allow 15 minutes per side with a few minutes for rebuttal. But as we often say, if we're engaged in an interesting colloquy with you, we're not real strict on time. We want to hear what you have to tell us. So let's begin then, please. Very good. Thank you, Your Honor. Thank you. Good morning. May it please the court, counsel, my name is Rob Carroll. I'm here on behalf of the appellants who are intervening plaintiffs in this matter. This lawsuit involves two counts, and each count involves a different partnership. Both counts were dismissed at different times in separate orders for lack of standing. And this morning I'm going to start with count one, which involves the IBP partnership. And that was the later order? That's correct. Okay. The first place I want to start here with this count is on the issue of whether the trial court had subject matter jurisdiction to grant essentially the relief that we sought in our response to the motion to dismiss. As I'm sure Your Honors recall from the briefs, the defendants in this case who were general partners of IBP caused the partnership to exercise a repurchase option in 2009 of the intervening plaintiff's interest in the partnership. And it's undisputed that that option could have been exercised at any time from 1993 through 2009. And almost immediately after exercising that option, defendants moved to dismiss this case, which had been pending since 2001 for lack of standing. And our response to the motion to dismiss was that we asserted waiver, latches, and an equitable good faith type of defense or response to the motion to dismiss. In the court's memorandum of opinion and order, she noted that she had some question as to whether those responses to the motion to dismiss were proper because they weren't raised in a complaint or an answer or some sort of pleading of that nature. And even though that wasn't the basis of a ruling, the defendants nevertheless raised the issue in their brief, and so I'm going to address it. Each of the three cases that defendants cite in support of their subject matter jurisdiction argument I believe are distinguishable because none of those cases dealt with an issue where new facts arose during the litigation and a motion to dismiss was filed on the basis of those facts, where an issue was placed before the court affirmatively by the defendants. And then in response to that motion, the plaintiffs addressed the issue and made their argument as to what they think the court should do with the issue. None of the cases cited by defendants involved facts like that. And the cases that they cite stand for the general proposition that for the court to have subject matter jurisdiction over an issue, it has to be placed before the court in a formal pleading. While I acknowledge that this is sort of a novel situation where I couldn't find a case directly on point, I think it's reasonable to conclude that the defendants put the matter before the court's subject matter jurisdiction through its motion to dismiss. Now, there was a case that we cited in our response to that motion, which we also cited in our appellate brief. It's Cessna v. DuPage County. It's an Illinois Supreme Court case from 1991. Admittedly, the facts are in no way analogous to this case. That case involved a civil case based on a DUI that or not, I'm sorry, not a DUI, but a car accident that killed another person. But in that case, the Illinois Supreme Court said that where equity has assumed jurisdiction for the purpose of granting equitable relief, the court may determine all the issues of the case. Here we have a case in Chancery for, among other things, equitable relief. And so we think that it would be proper for this court, and we think that the trial court has subject matter jurisdiction, therefore, over this issue of whether the defendant's attempt to cause our client's interest to be repurchased should be invalidated or not. Let's assume that the court did have such jurisdiction. Why don't you tell us on the issue of implied waiver, because there is no express waiver here, where there was, in your judgment, a clear, unequivocal, and decisive act that manifests their intention to waive their right to bring up this repurchase agreement. The strongest inditia that we have of an implied waiver is the length of the delay, from 1993 to 2009. Without a doubt, that's the strongest inditia we have. And then in addition to that, we have the fact that, obviously, throughout that time, our clients were treated as limited partners. They were paid distributions. Capital calls were made on them, which they paid. And in addition to that, we have the defense of this lawsuit. This is the people in the second deal. Correct. The two intervening plaintiffs that are at issue for this count are Mark Munarato and William Skrzlowski. That's why we call them Ski, right? That's why we call them Ski. So they contributed on their capital calls as opposed to the first ones? Is that what you just said? Correct. So the capital call that was at issue for count two, which involves the TB partnership, that capital call is for a different partnership that's not at issue for IVP. Understood. And so whatever capital calls were made as to IVP, our clients met. They met all the obligations that were required of them over the course of the years to remain partners. And so, really, that's what we have. We have the biggest factor being the delay and the length of the delay. The ongoing defense of this suit, which obviously, I mean, to us, indicates that if they wanted to at any point in time, they could have sought to destroy our client's standing to resolve to get rid of it as a way of getting rid of this lawsuit throughout that course of time. The fact that they didn't do so is another indicia of an implied waiver. Isn't it also possible that within the, you know, huge contract that you have here, that they just had forgotten that the repurchase agreement was somewhere buried within it? Yes, I would agree that it's possible. Reading the record, it sure seems like that might have been the case. It could be the case. If that is the case, how is that a clear, decisive, and unequivocal act? Well, I mean, I think it's whether it's through inadvertence or intentionally, you know, the fact that they didn't exercise it, it's almost more of an equitable argument. The fact that they didn't exercise it for that length of time, it's inherently, I think, unfair for this case to be dismissed on that kind of an issue without ever getting to the merits after all the time that was put into it. Are you basically saying that allowing a right that one has to remain dormant, to lie dormant for 16 years, and then to resurrect it at the end of a long period of litigation, something in the nature of ledges should attach? Yes, Your Honor. Is that basically your argument? Yes. Particularly in the case of... Without, as my colleague, my esteemed colleague is saying, without what's the overt act or what's the, you know, actual waiver that they actually waived? You're saying just letting your rights lie dormant long enough gives rise to ledges. In this case, I believe that's correct, Your Honor. And I think the thing that makes this case different than many of the waiver cases that were cited by both sides is that it involves fiduciary relationship where under Labovitz v. Stolen, which we relied on extensively, you know, this court addressed the issue of whether a fiduciary can be in breach of his duty when he exercised discretion granted to him under a contract. And so we don't dispute that the repurchase option exists in the agreement. We don't dispute that it was properly exercised under the terms of the agreement. Our argument is simply that as fiduciaries, it was improper for them to lie dormant for 16 years, you know, not exercising that option, and then after all of the events that have occurred over the last 16 years, to exercise that option in order to get out of this lawsuit without ever having it resolved under merits. Is Labovitz your best case for that? Yes. Do you think it is? Yes, Your Honor. And again, you're saying that in a sense it's mismanagement by a managing partner to do that or the general partners to do that to the limited partners? Correct. And therefore a breach of fiduciary duty? That's correct, Your Honor. Okay. What about the first one, the capital call? That's where I was just going to go. So now count two involving the TBE partnership, I'd like to break this down into two separate issues. The motion to dismiss was a combined 2-615, 2-619. And the 2-615 issue was whether the intervening plaintiffs for this count sufficiently alleged that the capital call was made in bad faith. And the allegation that is throughout our briefs is that the capital call would not have been necessary had the bonds not been misappropriated. The bonds paid the defendants over $13 million in cash. Initially it was over a period of years, interest payments of just over $4 million, and then the bonds were redeemed by the village for $9 million. And so our allegation is that, but for that misappropriation, there wouldn't have been a need for the $5.5 million capital call. And the 2-615 issue here is whether that has been sufficiently pled. And really what the issue comes down to is the defendants argue that our allegation is conclusory because it doesn't set forth enough facts about why the capital call would not have been necessary, but for the misappropriation. And our response to that is that, you know, on a 2-615 motion, reasonable inferences from the allegations are to be drawn in the plaintiff's favor, and the allegations are to be taken as true. And really what the defendants are doing is taking our allegation and making an inference that it's not true, and asking this court to draw the inference that none of that $13.5 million would have been available for the partnership to meet its financial obligations over the course of the years after the money was received, or after the bonds were redeemed by the village. It's speculation in one sense to say what would have happened had the bonds not been misappropriated, but in terms of what would have happened with the money, because that's a lot of money to come into the partnership at one time. But I believe that that's an issue that should go to the jury. The jury should hear the evidence, or the judge in this case, I apologize, should hear the witnesses and see the evidence to determine what would the management of the company have done with that $13 million if it had gone to the partnership instead of to them, and keeping in mind that as general partners they had a fiduciary duty to properly manage the company. So I don't think it's proper to simply assume that none of that $13.5 million would have been put into a capital account to address future issues that might come up with the company. Isn't part of your theory that there would have been no need for a capital call had some of that money or most of that money had gone into the partnership? Correct, right. Right. That's our theory. It's really an accounting issue. I mean, you could easily find someone to testify. Well, if you don't put $13.5 million into the coffers, you're short cash, so therefore you have to have a capital call. Isn't that basically what you're talking about? That's our theory, and that's our allegation. It's never been litigated in all these years of litigation. It's never been because of all the things we've been going through here. The TV account was dismissed, I don't have the year right in front of me. 05. 05. I mean, that was dismissed quite some time ago, and so during the time since then, there was extensive briefing on cross motions for summary judgment. Which were denied. Which were both denied. Right. And that was obviously on the IDP count that survived, so that issue has not been litigated. Ultimately, the Donnersberger order in 05, if I'm correct, denied your amended complaint and a request that the partnership interest be reinstated. Correct. And in going through the record, there was a Friday afternoon motion, you know, right before the capital call that where you guys came in on an emergency motion to, I don't know if it was to restrain or enjoin or whatever. If the capital call went through, you wanted to try to maintain your partnership interest. So my question is now, how can we in 2010 put this humpy dumpy back together again? Because at the time of the TRO, there wasn't, we hadn't presented evidence, because it was in an emergency TRO type nature. We hadn't presented evidence to support our allegations that the capital, that the bonds were, in fact, misappropriated. That the misappropriation was a breach of fiduciary duty. Or the fact that before that misappropriation, the capital call would not have been necessary. That's why once the complaint, there were actually two motions to dismiss. After it was initially dismissed, we saw reinstatement, where we then added those allegations to say we want to come into court and prove that one, the bonds, or the $13 million paid out on the bonds was misappropriated. And two, before that misappropriation, the $5 million that was later needed wouldn't have been needed from the limited partners as well as the general partners. Wouldn't it be easier to, you know, attempt to fix this problem judicially if the thing appealed from would have been the denial of the TRO on an interlocutory basis? Was that ever attempted? That was never attempted, no. All right. And what I think we're both trying to get at is when Judge Donisberger said, okay, if you can't meet the capital call, you lose your partnership, you're no longer partners, you're no longer standing by, that sort of was a pivotal moment in the whole case. And if someone had come up under 307, Rule 307, that would have been helpful. Because now what you're saying to us is, as I think your worthy opponent said, how do you unscramble the egg? I mean, how do you get this back together? It sounds as if once they did something that was legal, lawful under the agreement to call for a capital call, and you didn't do it, you lost your interest, where do you go from there? I believe – Because you're invoking equity, and what I think Judge Donisberger was saying was they have a legal right to do this. There is nothing in front of me that says anything about this is inequitable at that moment. I mean, is his order in front of us? Is this part of the appeal? We've not appealed from the decision on the TRO. It's never been appealed, so it's not really even in front of us. Right. I think the strategy or the thought process was that the capital – we weren't able to prove – I don't necessarily think we even tried to prove before Judge Donisberger on that day that the capital call was improper as a result of the misappropriation and the accounting issue about whether the money would have been necessary. So instead of dealing with it at that time, the thought was amend the complaint, make that a new claim. It's not unlike the issue with IBP where there's this repurchase event that happens, and it's now been suggested that once the repurchase happened, we should have sought leave to amend our complaint to seek restoration based on what we allege is a further breach of the fiduciary duty through the repurchase. And so really that's what we're doing – we did with the TV claim was instead of pursuing a Rule 307 appeal and dealing with it on a TRO basis, the decision was let's get the evidence, all the evidence before the court and amend complaint and seek restoration because if we prove the – in order to prove our right to restoration, we'd have to prove the misappropriation. And therefore, it's argued that we do have an interest in the outcome of the controversy that's set up by the derivative case. And so it just seemed like it fit together in one complaint. That would be the way to resolve it. Okay. Could they have used the repurchase agreement in the TB case as a way to remove the intervener's status or standing rather? That – there was a separate partnership agreement, but I believe that there was an identical provision there. I haven't specifically looked for that issue, but I believe that there was an identical provision. This might go back more toward what you're saying about the IBP matter, but part of the sleeping on their rights or sitting on their hands included not utilizing that earlier. Correct. For the TB partnership. Correct. Right. Okay. Unless you have any more questions, I am finished. Thank you, counsel. Thanks, sir. We'll hear you again in rebuttal. Very good. Thank you. Morning, counsel. Morning, Your Honors. I had prepared on the expectation I'd be seeing Mr. Carroll's partner, Mr. Joyce, here today, and they have very different arguing styles, so he's thrown me off. You're saying it's easier to argue against that, Joyce? No, I'm saying it's different. Okay. But, you know, all of us have gotten to know each other a little bit over the years on this case. We can tell. I'll start off, if I may, where you all left off, which is with count two and this question of the claim for restoration on the ground that the capital call would not have been necessary if the bonds had not been misappropriated. First of all, you know, I don't know that that's really adequately alleged, that the capital call still would not have been necessary. One of your honors asked a question about the accounting and, you know, how do you know what would have happened to the money. You know, I think that's something that probably needs to be explained in the complaint. It doesn't follow that if a partnership receives some amount of money in 1999 that it's still going to be sitting in the bank account in 2003. I think, you know, that there is you guys have a 35-volume record, and I've lived pretty much most of the pages of that volume. So, you know, there is deposition testimony and there's other places where it was put before the court that for tax reasons partnerships generally distribute their income to their partners because it's taxable to the partners when it's received by the partnership. Right. And there's no real advantage to the partners of leaving some millions of dollars sitting in the partnership. So I honestly can't tell you right now whether that was submitted in support of this motion, testimony to that effect. I believe, actually, that let me get a second. Sure. I think it may be. I think it may be in the Tom Collins deposition that the plaintiffs submitted in their brief in opposition to the motion to dismiss count two. In any event, it is a motion to test the sufficiency of the complaint, and I think there's a real question whether the complaint really connects that particular dot that you can assume had the bonds not been misappropriated the money would have been sitting there when it was needed five, six, seven, eight years later. I have a more fundamental gripe, if you will, or challenge to that allegation. I agree that's the central allegation of the amended complaint as it relates to count two, the TB count. Our argument, Mr. Carroll said that our argument was that the allegation was conclusory because they don't state sufficient facts about why the capital call wouldn't have been necessary if the bonds had not allegedly been misappropriated. Our argument is different. It's conclusory because it doesn't tell you why, even if you assume it's correct that the capital call wouldn't have been necessary if the bonds had not been misappropriated, I don't think that it follows from that that the capital call was in bad faith. So the dots that we're really primarily arguing were not connected was the connection to the idea of bad faith. It seems like from the perspective of your opponent here that they're being asked to put money into, like if you use a card analogy, a card game, that they're being asked to put money into what they think is a rigged game. I mean, they think that you've already gotten all this money, you didn't tell us about it, and now you're coming to us and asking for money when you've paid yourself, you know, a ton of money. You know, that might be right that that's what they're saying. I mean, there's a couple of problems with it. One is, you know, just simply it assumes its own conclusion. It's a bootstrap in that sense. And I think that in part that's what Judge Donnersberger is saying in his opinion where he says they haven't alleged an injury or facts, they haven't alleged wrongdoing to themselves. They're still relying on the same single act of wrongdoing, which is this alleged misappropriation. That's a wrong as to the partnership. And I think what Judge Donnersberger is saying in his December 2005 opinion is that that's a bootstrap. That's not an individual wrongdoing as to you. You've kind of just taken the same derivative claim and now you're saying it's an individual claim. The second one. But I think, again, I want to try to come back to this idea that that it doesn't equate to bad faith, to say that the capital call wouldn't have been necessary doesn't equate to bad faith. First of all, I think Your Honors know that the complaint does allege, and we are, of course, testing the sufficiency of the complaint, and the complaint does allege that the partnership had a genuine need for money. That's not in dispute. They allege that Kmart had gone bankrupt. They allege the income was insufficient. They allege that the lender had filed a foreclosure. So there's no dispute that the partnership needed money. I think there's very little dispute about anything that's in Mr. Collins' affidavit, to tell you the truth, other than the fact that Collins says that he advised these people who were given these little freebie limited partnerships that when the bonds were going to be sold, we, the general partners, were going to take the money. Other than that, I think everything was agreed to. That's right. I think you're right about that. I think you're right. But suppose, I have a bunch of different ways of going at this, but I suppose one thing is to ask is, well, then, given that everyone agrees there was a need for money, what were the defendants supposed to do instead of a capital call? If it's bad faith to issue capital calls, say, partners, we need money, everybody pony up your share, what were they supposed to do otherwise? Now, their complaint and their briefs don't give any answer to that. But even within the facts of this case, didn't they attempt to put together a settlement agreement and in essence handle the capital call themselves, the general partners? They did. That was offered to do a settlement. That's one way that it could have been done. Well, there was still a capital call. The way the settlement was structured was that the partners would then lend the – you're correct. In lieu of the capital call, they would have made a loan. Right. Perhaps. And they could have used some of that after-tax money that they had from, you know – Oh, I think there's certainly lots of things that they could have done, but the complaint doesn't allege that you should have done X. You know, they say, we know you needed money and it was bad faith to come to the partners for it. I think they need to say, well, what were you supposed to do instead? If their theory is the defendants should have put in the money themselves, I mean, that's what I kind of infer is what they're saying. They don't actually say that anywhere, but I think that's what they're driving at. That's sort of what the defendants – yeah, what the defendants were trying to do with the settlement that they're putting together, using their own money in lieu of the capital call and keep the gang all together. Isn't that right? I mean, they were offering that as a settlement. I don't think they can prove anything more if that's already been done in the case itself. Well, I guess the question is, is it their position then that it's bad faith for the – That the agreement failed. That they didn't voluntarily, you know, put in the money themselves out of their own pocket? Is that – because I don't think that's a valid claim. I don't think they can defend that position. They certainly haven't cited any case law that would support the idea that – Can I jump in? I think as I read it, and we're all trying to figure this out, as I read what they're saying was it was a sharp practice to require us, knowing that we could not meet the capital call, to make a capital call upon us, and that you did so knowing that it would force us out. And that this was a sharp practice, lawful under the agreement, complying with the terms of the agreement, but you knew darn well it was, in a sense, going to push us out, and that was inequitable. Well, that's interesting. I would say that's the point of distinction between this case and the Labovitz case that they rely on. In the Labovitz case, the general partner was sitting on a pile of money. Right. And the limited partners had large tax bills. Right. And in the past he'd always distributed the money so they could pay their taxes. And then he says, well, this year I'm not distributing you guys any money. It's in my sole discretion not to do it. Because it's in my discretion. And I'd like to buy you out really cheap because you're in duress. Right. Okay? Right. So that's a sharp practice and was, you know, using his discretion for no business reason other than to put pressure on the limited partners so he could buy them out on the cheap. Right. This case is different. There was a business reason that the partnership needed the money. There's no dispute about that. I don't think they're disputing that. But I think the question is what's the implication of that fact. If the central fact that we're dealing with here is that the general partners got the limited partners in for nominal amounts of money and paid them money from time to time with the understanding, according to Mr. Collins from his detailed affidavit and deposition testimony, that we, the general partners, we're going to take these developer or junior bonds. Okay? And they're supposed to agree to it. Why is that not in either of the partnership agreements? I guess all I can say is everybody would be happier if it were. But, you know, I mean, that's why we're here. It should have been. I mean, if everything else is in there, including these repurchase agreements buried on page 82 or something. You know, I wasn't around. And that's the central issue here. Completely agree. But I wasn't around when they were drafted. I can't tell you, you know, other than I certainly, you know, we all see lots of instances where people take the last form and put in the new names and, you know, something didn't get thought through is the only answer I can give you. The absence, its absence in the agreement does lend some substance to the suggestion that this was a sharp practice. And it was, you know, just, you know, we'll do what we can. We'll take advantage of them as much as we can because we're the general and they're limited partners. I hear what you're saying. I'm not saying it's true, but I'm saying it. I think really, though, that's the merits of the case. That's the question of whether the defendants were entitled to have these bonds or not. And we didn't get that. I think it's worth saying that Judge Donnersberger did hear a four-day fairness hearing where most of the evidence was on these issues. On the proposed settlement. Well, not only the proposed settlement but the merits of the case, right, because he has to evaluate is the proposed settlement appropriate in light of the nature of the claim. But his hearing was about the proposed settlement. It wasn't a four-day hearing on the merits. Correct. Even though much of the merits are thrown in there. That's right. That's correct. The Collins Affidavit and I think probably in several other places, it is shown that the general partners in the case of TB, the bonds were distributed to them against their capital accounts in the partnership. So their capital accounts were reduced dollar for dollar by the face value of the bonds. So it's not that they didn't pay for it. Now, we haven't gotten into this. We haven't had any kind of adjudication. We're hearing on the evidence. But it's not obvious that, in fact, the bonds were misappropriated. So another way of looking at kind of what's wrong with count two, why it doesn't connect the dots, is to say, well, what if you went through this whole process and six years later you finally have an adjudication that it wasn't a misappropriation, that the defendants gave proper consideration or, for some other reason, they were properly entitled to the junior bonds and nothing had been misappropriated. You know, kind of now what do you do? Well, it's not just a misappropriation or that they were entitled to them. It's also the valuation. You have the issue of the gentleman from William Blair giving a range and then Mr. Collins picked the figure of $550,000 and then ultimately they were redeemed for, let's just say, a heck of a lot more. I think that that's with respect to the IVP partnership to count one, that we had the opinion from Mr. Freeburg on valuation. Really? I believe so. Although you're basically right about what happened with respect to that partnership. This one, there was a letter from a different, the underwriter for the Village of Broadview, who said that he wasn't able to put a value on them. They were not marketable. He wasn't able to test a market or give an opinion. Which was incorrect. Mr. Heise, I think. Incorrect. I'm sorry? There was a market for them, right? No, I think there were not. The testimony from, now Mr. Heise has never testified. Mr. Freeburg was deposed by the plaintiffs. And his testimony is essentially he marketed, the senior bond was marketed at the highest value. What they do is they sold as much senior bond as the market would bear, $10.2 million. And that's what his job was to go out and sell it, and he did. The rest of it was the amount that the TIF statute would permit, but the market would not buy because of the risk profile. So it was issued as a subordinated bond that was not marketable. And I'm pretty sure that his letter, we could find it here, said the same thing, that it's not marketable. You know, his opinion was it would be between $250 and $750 or something like that, and $550 would be a fair number in the midpoint is, I think, the gist of what he said. He did throw out the figure of $550, and I'm sure we have the document in the record here somewhere. Yeah, I think Mr. Collins chose that figure, and it was sort of in the upper end rather than in the middle, is what I recall. You know, I could find the letter. But I think that's, again, that's really talking about the merits of the case, which we didn't get to. And our position simply is, you know, there was a capital call. It was for valid business reason. There was no dispute there was a need for money. Their argument is that just because we'd asserted this claim of bad faith, you're not allowed to make a capital call. And I don't think that adds up. And we do make the argument in our brief, I think it's worth taking a minute on, that this would really disrupt the functioning of partnerships. You now have a situation where any partnership makes a capital call, and it happens every day. A limited partner comes and says, no, you general partners have acted in bad faith. You stole some money or you wasted assets. You made bad investments. You didn't do the proper due diligence on something. Whatever it is, I'm not paying my capital call because you acted in bad faith. And I think under the plaintiff's construction of the law, the ruling they're asking for, that limited partner in those situations would be entitled to withhold their share of a capital call until the issue is adjudicated of whether they're on the merits of this claim for bad faith that they assert. I think it would prevent partnerships from being able to make and enforce capital calls. If they were enforceable only after the general partners disprove an allegation against them, it's very easy for people to make allegations. So I could say more about this, but I think I should probably take a couple of minutes to address count one, the latter of the two orders. I still get confused about the timing being backwards. And I think really, you know, in a way, there's not a lot that I can do to embellish Judge Rotsford's decision. She wrote a seven-page reasoned decision that makes it very clear that she did a lot of homework and gave a lot of careful thought. And the plaintiffs in their brief here have not cited any new authority that they didn't cite to her, and she distinguished all the cases and addressed all the arguments. On the point of jurisdiction, you know, I think I understand what Mr. Carroll is suggesting, but I don't ‑‑ I'll take just a minute and look over the notes here. You know, I guess what I would say is I'm not persuaded. They have not cited a case. As he concedes, they don't have a case on point. And, you know, we've cited a number of cases, and I think it's a fairly bedrock proposition that we cited three or four cases, but we could have easily cited 10 or 15 that a court doesn't have jurisdiction to grant relief in the absence of a pleading that requests the relief and sets forth the basis for that relief. And it's one of the reasons we struggle a little bit with, well, exactly what is it they say constitutes the waiver or what facts are they saying are basis for waiver versus waiver for latches, is because there isn't a pleading that says here's what relief we're seeking and the basis for seeking it. Right before now Justice Rochford made that ruling, was there another dispositive motion, a motion for summary judgment, that had been denied? Yes. Well, there were cross motions for summary judgment on the merits of the case, on the value, on the Freeberg opinion, on whether $550,000 was a fair value or not. And what she found was the facts were sufficiently disputed that she could not grant summary judgment for either party. Okay. So what we had in this case was Ms. Pilot brought the lawsuit, then Ms. Pilot was gone, and then the other interveners came in. Judge Donnersberger had his several rulings, the capital call and all of that, and then dueling motions for summary judgment on count one are undertaken in 2009, and then after those don't resolve the case, all of a sudden somebody says the repurchase agreement. How does that come about? Well, I'll answer the question, but I need to start by saying it's not in the record.  Well, the cross motions for summary judgment were denied, and I kind of came into the office early one morning or late one night and said, okay, we've got to figure out where we're going with this case. Maybe I'll just sit and read that partnership agreement front to back. I haven't done that in a long time. And exactly as you suggested earlier, it had been overlooked, and we all spent some time kind of pointing fingers, isn't exactly the word, but kind of wondering, well, how is it that so many people have been looking at these partnership agreements in so many different ways, and not just for this litigation, but these partnerships are conducting business along the way, you know, and the partnership agreements are being invoked for all sorts of other reasons, but, you know, it was overlooked. I mean, these guys left in the 90s, right? They left in the early 90s, 93, 94. But I think that, again, you know, with respect to the merits of, you know, whether that delay constitutes a waiver, and I think Your Honor really gave the answer to that, that, you know, a waiver has to be unequivocal evidence of the intent to relinquish a right, and it's not unequivocal evidence where it's equally possible that someone just overlooked it and it wasn't an intent to relinquish a right. And as Judge Rochford pointed out, the agreement does explicitly say it can be exercised at any time thereafter. To the extent that they're trying to make it into a prejudice argument, which started to kind of the discussion started to go that way and say, well, it's because they're fiduciaries and they waited so long, and it's kind of, you know, they're starting to say, well, in some way they're prejudiced because there was all this litigation that went on and so on. You know, they haven't alleged that as a basis of prejudice. What they allege as a basis of prejudice is that their contingent fee counsel have invested a lot of time in the case. That was considered squarely by Judge Rochford, and they admit they have no authority in support of it, and we've, I think, explained in our brief why we think she was right about that. I want to come back just once more to count two and the issue of restoration, which I think is the more difficult of the two counts. I still struggle with how to articulate this idea that the fact of the alleged misappropriation isn't sufficient to mean that the capital call was issued in bad faith. I think another way of saying that might be that the general partners are disputing this claim, and unless they were showing that they're disputing the claim in bad faith, it's wrong to suggest they have to pay the money first. You know, they're supposed to pay back the partnership with respect of the bonds because this claim has been filed but not yet adjudicated. I think that the only way that that would make any sense would be to say that it was being defended in bad faith. That has not been alleged, and I think having seen the cross motions for summary judgment, you know, that that would not be a viable allegation, at least in this case. Whether it might be a way to connect it up in some other case, I'm not sure that you all have to reach. And then there was also some allusion made by one of your honors earlier that there's a problem with the remedy itself, of how would it actually work, and with inequity to the other partners who did fund the capital call that was funded. The partnership was successfully reorganized. The mall became profitable again, and it's since been sold at a profit, and those profits have been distributed to the partnerships in respect of their proportionate shares. I don't think that just first as a matter of equity that these partners can be in a situation where, had it gone south, you know, they just walked away. Well, sorry, you know, we weren't part of that. Now that it's profitable, they say, well, we want restoration. You guys took all the risk. You put your dollars on the table, but we want now to come back to the table and get our piece of that again. Where they had, over all this time, an option to walk away if they didn't like the result. And then there's the question, just the practicality, as we said in our brief on scrambling the egg. You know, I'm not even sure really who's the right defendant against whom restoration can be granted. Where did their partnership interest go? Who has it? That's not alleged. I'm not sure actually that I know the answer, because the partnership agreement is set up so that it can happen a couple of different ways. You know, if you're going to restore that interest, what would it even mean in the context of a partnership that's now all but liquidated, all but dissolved? It doesn't have any active business really other than this piece of litigation. So I think that that's a whole other set of problems that the plaintiffs have not given us any kind of answer to and would preclude that relief. Thank you, Counsel. Thank you. Thanks. To go back to Count 2 on TB, just briefly, counsel argued that the issue, the 2615 issue that they have with it, with that count, is that they just don't see how we've alleged that the capital call was bad faith, even if you take our allegation as true. If you go to the actual paragraph of the partnership agreement, it talks about the general partner's ability to make capital calls. It's paragraph 5C of the partnership agreement. And I'm paraphrasing. I'm not going to bore you by reading it verbatim, but I can if you'd like. That provision says that if defendants, TB's general partners, determine that A, additional funds are required by TB to satisfy partnership obligations, and B, such funds are not otherwise available to TB on terms acceptable to the defendants, then defendants may issue a capital call to all of TB's partners. Our allegation is that in making that determination that they're given sole discretion to make, it was bad faith for them to say, well, the funds aren't otherwise available, so we're going to ask all of you to contribute the money, when the reason that the funds aren't available is because our allegation is they misappropriated the funds that could have been there to meet the financial obligations of the company. What should they have done, in your judgment, when they decided to sell the bonds, redeem them, whatever the, you know, you said that they misappropriated them. They came into all this money. What should they have done before that happened? And what rights did the limited partners have that were violated? There should have been a full disclosure to all of the limited partners about, here's what we intend to do before it's been done. We're going to buy these bonds. Here's the price that we intend to buy them at. The TB bonds were, TB was paid nothing by the defendants for those bonds. If they had gone to all the limited partners and they would have said, we're going to take these bonds from the partnership, they have a face value of $8 million, we think they're probably not worth $8 million. Maybe they are. We don't really know. It depends on the success of the development. But we're going to take them, and we're not going to pay the partnership anything for it because we feel like they're being fairly compensated through the interest you've been given in this partnership. You know, that's what we're going to do. You don't have any problem with that, right? Obviously, because I'm standing here today, there are limited partners who would have stepped up and said, absolutely, we have a problem with that, and they would have objected. You know, this is a confusing record, and you've got the two different counts here and different times and everything, but the $550,000 that was distributed and some of the limited partners got some of that money, did that relate to the TB partnership or the IBP? That was IBP. All right. So how much money was obtained by the general partners relative to the junior bonds or developer bonds, whichever they were called, for TB? For TB, there was interest paid of roughly $4.3 million, and they were redeemed for, I believe, $9 million. So total, it was right around $13.5 million. And what you're saying is that the limited partners on that deal didn't get anything? Nothing. That's correct. And just to address a point that Your Honor raised, even though I agree with opposing counsel that it is more to the merits of the case, the question of, well, why wasn't there just a disclosure made in the partnership agreement? I obviously wasn't there. I can't answer that question either. However, what I can say is that in the huge volumes of documents that accompanied the issuance of these bonds, there were disclosures made by the general partners that the bonds would not be immediately received and they were. So, I mean, I don't know if that disclosure was not put in the partnership agreements because it contradicted acknowledgments or statements that had to be signed in order to get the bonds issued, but that's certainly a possibility. One of opposing counsel's last arguments on the TB count has to do with the appropriateness of the remedy and an assertion that what our clients have done is to sit back and wait to see whether the company is going to be, whether TB is going to be profitable before asking for restoration. I take issue with that argument because we sought restoration immediately after the capital call took place and we didn't meet the capital call. You know, it happened right away in response to a motion to dismiss. We asked for restoration. Judge Donnersberger pointed out that we didn't have that relief specifically applied in our complaint, which we wouldn't have because it, right, and then we amended the complaint. So this isn't a situation where, you know, in 2005 we don't meet the capital call, we sit back for four years, see the development, you know, the shopping mall being sold and say, well, we want a piece of that action. We've been there. We've been asking for this from day one. So this isn't a sit back and wait kind of situation. If you were to, let me just ask one question. If you were to articulate either the category or the amount of damages that you're entitled to on count two, the TB count, what would your answer be? $13.5 million. I think it's, well, let me take it. Actually, I think it would be the entire amount. Well, sure, I mean, I'm talking about for the partnership. Yes. Right. But with the exception, and I don't have the case name on the top of my head because this wasn't in the briefing, but there is an Illinois, I believe it's a first district case that says that in this, in a derivative case where the partnership is seeking damages for a harm done by the general partners, the general partners don't get to share their pro rata share in that recovery. Because of their malfeasance. Correct. So I agree, pro rata share with the exception of the general partners wouldn't share in that recovery. Stop me if I'm wrong, but my reading of the limited partnership agreements, both of them, is that the definition of partners without description as a general or limited shall include the general partners and the limited partners. Do we agree on that? I believe so, yes. Okay. And then on page 10 of what I believe is the IBP limited partnership, and also there's a similar paragraph, I think, in the other limited partnership agreement, there's a description of what happens if there's a profit on the sale, condemnation, foreclosure, or other disposition of partnership assets. Do you think that the refinancing of those bonds was the sale, condemnation, foreclosure, or other disposition of a partnership asset, or was it something else? I have to be honest with you, I haven't read that provision in so long, I would have to sit down and read it and think about it. I don't have an answer as I stand here. I apologize. That provision describes who gets what. But I'm trying to figure out whether or not refinancing of these bonds by the village is part of what they're talking about. And you're not sure? I have to be honest with you, I don't have an answer to that as I stand here. I'm sorry. Thank you. Thank you, Your Honor. Thank you very much. I'd like to thank counsel for the cogent and dispassionate presentation today and for the very well-written briefs. Thank you all. If it's appropriate for me to correct one thing, Your Honor. Go ahead. It was in response to a question from Justice Ladman. Mr. Carroll said that the limited partners did not get anything, and the TV box in the IVP where there was a jackpot for $550,000. What happened was, it's not correct, though, that there was nothing, the limited partners didn't get anything. The general partners did not pay money, but it is in the record that they reduced their capital accounts, their partnership capital accounts dollar for dollar. So with that, the ultimate effect of that is the partnership ultimately winds up in business. Either the limited partners will get more of the assets than they otherwise would, or the general partners will pay more of the taxes or some combination of those two things. We know the limited partners got around $58,000, I believe. I mean, that's not in dispute, is it? Didn't they receive some money for their $5 contributions? That was on the record. I'm in the wrong partnership, probably. They did receive, though, amounts in that range for both partners. For both partnerships. I don't know the dollar figure. Okay. It's on the record. It's in the record. Okay. Thank you. Thank you very much. We are adjourned.